J. ALEXANDER LAWRENCE
ALawrence@mofo.com
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone: 212.468.8000
Facsimile: 212.468.7900

WILLIAM FRENTZEN (*pro hac vice*)
WFrentzen@mofo.com
MICHAEL BURSHTEYN (*pro hac vice*)
MBurshteyn@mofo.com
LARA MCDONOUGH (*pro hac vice*)
LMcDonough@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105
Telephone: 415.268.7000
Facsimile: 415.268.7500

RAFAEL YAKOBI (*pro hac vice*)
rafael@thecryptolawyers.com
THE CRYPTO LAWYERS, PLLC
848 Brickell Avenue, Penthouse 5
Miami, Florida 33131
Telephone: 619.317.0722

*Attorneys for Plaintiff Mango Labs, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MANGO LABS, LLC,

          Plaintiff,

-against-

AVRAHAM EISENBERG,

          Defendant.

---

Civ No. 1:23-cv-00665-LJL

**MANGO LABS, LLC'S NOTICE OF SUPPLEMENTAL SUBMISSION REGARDING APPLICATION FOR A PRELIMINARY INJUNCTION**

sf-5431246

Mango Labs, LLC ("Mango Labs") provides this notice following the Court's request for supplemental submissions from both parties regarding the distinction between Mango Markets depositors ("Depositors") and MNGO token holders ("Token Holders") with respect to Defendant's attack and whether votes by Mango Decentralized Autonomous Organization ("DAO") members bind Mango Markets Depositors.

The distinction at issue is important because **_less than 1%_** of the Depositor accounts with claims against Defendant voted for the Defendant's purported "settlement" agreement ("Proposal"). (Supplemental Declaration of Dafydd Durairaj ("Durairaj Supp. Decl.") ¶ 7.) To the extent the Proposal could be deemed an enforceable settlement, and Mango Labs contends it cannot, Defendant indisputably did not settle with the vast majority of those whose property he unlawfully converted. Nor were Depositors bound by the Proposal. There is no agreement by which they consented to be bound by votes of Mango DAO members. (*Id.* ¶ 10.) Mango Labs contends that if there is any case where the well-established doctrine of economic duress should apply, this is it. But the fact that over 99% of the Depositors never voted for the Proposal is yet another reason Mango Labs is likely to prevail on its declaratory judgment claim. These facts buttress the claim of economic duress and lack of an arm's length negotiation in connection with the Proposal.

### A. Breakdown of Mango Markets Depositor and Token Holder accounts and their role in the Proposal vote.

Depositors hold accounts on Mango Markets. (*Id.* ¶ 4.) "Token Holders" refers to wallet addresses who hold MNGO tokens anywhere on the blockchain. (*Id.*) Not all Token Holders hold MNGO tokens on Mango Markets. Token Holders can use the MNGO tokens to vote in Mango DAO proposals. (*Id.*) At the time of Defendant's attack, there were 25,795 Mango Markets Depositor accounts and 18,688 MNGO Token Holder accounts anywhere on the blockchain. (*Id.* ¶ 5.) Only 31.52% of Mango Markets' Depositor accounts held MNGO tokens at the time of the attack. (*Id.*) Defendant's attack depleted Depositor accounts, including these Depositors' MNGO tokens. (*Id.*) As such, Defendant deprived these Depositors of the MNGO

tokens they held in these accounts for voting. (*Id*.) The only voters on the Proposal were "Token Holders" who held tokens outside of Mango Markets at the time of Defendant's attack. (*Id*.)

Through his attack, Defendant took the Depositors' collateral. This included a mix of tokens, including Bitcoin and Ethereum, among others. (*Id.* ¶ 6.) 68.48% of Mango Markets Depositor accounts did not hold any MNGO tokens. (*Id*.) Defendant thus converted the other tokens those Depositors held. Defendant's attack differed from a traditional pump-and-dump scheme. It was not about pumping value to make a gain (by fraud or otherwise), closing the position, and leaving the asset price to drop. Defendant instead used his surreptitious MNGO inflation on third-party exchanges to exploit a blockchain software oracle that reported the MNGO price to Mango Markets. (*Id.* ¶ 2.) Then Defendant withdrew all collateral on the platform—collateral that was not his to take. (*Id*.)

The attack occurred on October 11, 2022. (*Id.* ¶ 1.) The Proposal vote occurred days later, beginning on October 13, 2022 (and ending on October 14), due to the unreasonable time constraints that Defendant imposed. (*Id*.) Only 0.062% of Depositors' accounts voted for the Proposal. (*Id.* ¶ 8.) 0.019% of Depositor accounts voted against the Proposal (*Id.* ¶ 9.) 99.919% of Depositors' accounts comprising over $100 million in value (prior to Defendant's attack) did not vote. (*Id.* ¶ 7.)

Mango DAO votes for the Proposal did not bind non-voting Depositors. Mango Markets is an open-source protocol. (*Id.* ¶ 10.) It did not have a Terms of Use at the time of the attack. (*Id*.) There are no agreements by which Depositors consented to be bound by Mango DAO votes, much less those in which they did not participate. (*Id*.)

### B. The distinct claims, rights, and roles of Mango Markets Depositor and DAO Token Holder accounts means Mango Labs is likely to succeed on its Declaratory Judgment claim.

The distinction between Depositors and Token Holders shows that the Proposal is not a binding agreement.

2

sf-5431246

Provided only two days after the attack to decide whether to accept the Proposal or potentially lose all of the misappropriated assets, those who did vote did not have time to determine viability of legal claims or investigate the facts or mechanism of the attack before acting. These voters, distressed over the loss of deposits on Mango Markets, were confronted with an unidentified attacker and the threat that this attacker would disappear with the converted assets that *did not belong to him*. Indeed, even DAO members who communicated with Defendant did not know who he was. This is why the Proposal's language is directed "to the controller of the wallet" associated with the attack, rather than identifying Defendant.[1] (*Id.* ¶ 3.) Although Defendant was not (and is not) a convicted criminal, his conduct appeared criminal and in violation of law.[2] Voters rightfully feared Defendant would flee the country with the converted assets if they did not accede to his demands and they would be left with nothing.[3] As such, the negotiations and vote that followed are more akin to a ransom negotiation following a software exploit than an enforceable settlement agreement.

Defendant's conduct falls within the well-established claim for economic duress under New York law. His sophisticated scheme to manipulate and exploit blockchain oracle software to withdraw market collateral, rather than merely pump and dump the price of a token, and then immediately turn around with a settlement demand is classic economic duress. It is akin to a

---

[1] While Defendant boasted about the attack online, it is not uncommon in crypto for unaffiliated persons to take credit for attacks online despite not having been involved. In his communications regarding the Proposal, Defendant communicated through an encrypted email account labelled only "mangotrader". (*Id.* ¶ 3.)

[2] As evidence of Defendant's own consciousness that his scheme was illegal, Defendant insisted that Token Holders agree not to "pursue any criminal investigations." This is not something parties can lawfully contract to do. *See, e.g.*, *United States v. Farrell*, 126 F.3d 484, 486 (3d Cir. 1997) ("it [is] a crime to attempt to 'corruptly persuade' someone in order to 'hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense.'") (quoting 18 U.S.C. § 1512(b)(3)); *see also* Stephen Gillers, *Speak No Evil: Settlement Agreements Conditioned on Noncooperation Are Illegal and Unethical*, 31 HOFSTRA L. REV. 1 (2002) (explaining how "noncooperation agreements whose purpose is to prevent the plaintiff from voluntarily communicating information about conduct to third persons in order to prevent discovery of the conduct and reduce the risk of liability," unlawfully obstruct justice under federal law).

[3] He did flee the country, although DAO voters were not aware of it at the time. *U.S. v. Eisenberg*, No. 1:23-cr-00010-RMB, ECF No. 1 ¶ 18.

sf-5431246

ransomware exploiter demanding a ransom after exfiltrating data from a network.[4] Defendant should not be permitted to escape Mango Labs' claims by virtue of the Proposal vote, which 99% of the wallets he exploited did not vote for, given the case law on this issue. *See, e.g., First Nat. Bank of Cincinnati v. Pepper*, 454 F.2d 626, 632 (2d Cir. 1972) (quoting *Hellenic Lines, Ltd. v. Louis Dreyfus Corp.*, 249 F. Supp. 526, 529 (S.D.N.Y.1966), *aff'd.*, 372 F.2d 753 (2d Cir. 1967) ("where one party has control or possession of the goods of another and refuses to surrender such goods to the owner thereof except upon the latter's compliance with an unlawful demand, a contract made by the owner to emancipate his property is considered as one made under duress . . . ."); *Haymount Urgent Care PC v. GoFund Advance, LLC*, No. 22-CV-1245 (JSR), 2022 WL 2297768, at *14 (S.D.N.Y. June 27, 2022) (denying motion to dismiss where defendant alleged to "induce financial paralysis" in order to "induce[] consent to the release through wrongful economic duress by allegedly holding [a] bank account ransom with unlawfully issued UCC lien notices"); *Bloss v. Va'ad Harabonim of Riverdale*, 203 A.D.2d 36, 39–40 (1st Dep't 1994) (reversing grant of summary judgment for defendant because "it is inequitable to allow a release to bar a claim where, as here, it is alleged that the releasor had little time for investigation or deliberation and that it was the result of overreaching or unfair circumstances"); *Rust v. Drexel Firestone Inc.*, 352 F. Supp. 715, 717 (S.D.N.Y. 1972) (noting that because "[d]uress . . . is [a question] of degree" and that "[a]s a practical matter it is obvious that there is no line of absolute demarcation," the pressure must go "beyond what is reasonable under the circumstances").

---

[4] Mango Labs is prepared to provide supplemental briefing to the extent the Court would find it valuable for the parties to present a deeper survey of the duress and fraudulent inducement standards considering the above distinctions between Depositors and Token Holders. This would include applying the facts of Defendant's scheme to factors under New York law, such as an unlawful threat where the individual has not yet been convicted of a crime in connection with the scheme, whether there was exercise of free will, the import of Defendant's insistence on a decision on the Proposal only days after the attack, and whether the monetary terms of the Proposal were unconscionable, among other things.

5

Dated: New York, New York  MORRISON & FOERSTER LLP
February 28, 2023

By:    */s/ Michael Burshteyn*
      Michael Burshteyn (*pro hac vice*)

      *Attorneys for Plaintiff Mango Labs, LLC*

sf-5431246